J-S06022-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ENOCH SMITH | |
| Appellant | No. 277 EDA 2014 |

Appeal from the Judgment of Sentence July 22, 2013
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0004422-2012
CP-09-CR-0007731-2012

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED FEBRUARY 06, 2015**

Enoch Smith appeals from the judgment of sentence entered in the Court of Common Pleas of Bucks County following his jury trial and conviction on charges of Corrupt Organizations,[1] Promoting Prostitution,[2] Criminal Use of Communication Facility,[3] Manufacture, Delivery or Possession with Intent to Deliver a Controlled Substance,[4] Conspiracy,[5]

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 911(b)(3).

[2] 18 Pa.C.S. § 5902(b)(1)-(4), (6).

[3] 18 Pa.C.S. § 7512.

[4] 35 P.S. § 780-113(a)(3).

Rape[6] and Sexual Assault.[7] After our review, we affirm the judgment of sentence and rely on the opinion authored by the Honorable Wallace H. Bateman, Jr.

The trial court's opinion sets forth the facts of this case in detail. ***See*** Trial Court Opinion, 5/16/14, at 1-10. To summarize, Smith conducted a prostitution enterprise in Bensalem Township, Bucks County, and in Philadelphia County, preying upon and exploiting young women who were addicted to drugs. Smith provided the women with heroin to feed and maintain their addiction, and in exchange required them to serve as prostitutes. At trial, four of Smith's "employees" testified; they stated that they were paid in drugs and if they did not have sufficient dates they had to have sex with Smith or suffer withdrawal. One woman testified that at the time she started working for Smith she had just turned 19 and had never done this type of thing before; after her second "client" she told Smith she would no longer work for him. In response, Smith became angry and raped her.

Following Smith's convictions and a determination that he was a sexually violent predator (SVP), Judge Bateman sentenced him to a term of

*(Footnote Continued)* _____

[5] 18 Pa.C.S. § 903(a)(1).

[6] 18 Pa.C.S. § 3121(a)(1).

[7] 18 Pa.C.S. § 3124.1.

imprisonment of 40 to 80 years. Smith filed post-sentence motions, which Judge Bateman denied. This appeal followed. Smith raises the following issues for our review:

1. Did the trial court commit an error of law or abuse of discretion by improperly considering and failing to disregard in total a presentence investigation report produced from the Bucks County Adult Probation and Parole Department wherein the conclusions and averments in the report were tainted by the inclusion of an interview with the appellant conducted in violation of his privilege against self-incrimination guaranteed under the Fifth Amendment of the United States Constitution and Article I, section 9 of the Pennsylvania Constitution?

2. Whether the sentencing court's imposition of an aggregate sentence of not less than forty years nor more than eighty years' incarceration on information numbers 4422/2012 and 7731/2012 was unreasonable and manifestly excessive in that the aggregated sentences exceeded the aggravated range of sentencing [guidelines] and violated the fundamental norms of sentencing in that the sentencing court failed to properly consider the rehabilitative needs of the appellant under 42 Pa.C.S.A. § 9721(b)?

3. Did the trial court commit an error of law or abuse of discretion in declining to approve the appellant's presentence request for the retention of a forensic psychologist/psychiatrist expert to assess the appellant's mental condition, mental health considerations in sentencing, drug and alcohol assessment, drug and alcohol considerations in sentencing, psychosocial history, educational history, vocational history, the appellant's potential for rehabilitation and to rebut the presentence investigation and SVP report relied upon by the court in imposing sentence?

4. Whether the trial court erred as a matter of law or abused its discretion in granting the Commonwealth's motion to consolidate information numbers 4422/2012 and 7731/2012?

5. Whether the trial court erred as a matter of law in denying the appellant's pretrial objection to venue in criminal information number 7731/2012?

6. Whether the trial court erred as a matter of law or abused its discretion in denying the appellant's post-sentence motion for judgment of acquittal or new trial on the grounds that the verdict of guilt as to the charges of rape by forcible compulsion and sexual assault was against the weight of the evidence as the convictions improperly rested upon the contradictory and uncorroborated testimony of Commonwealth witness J.S.?

We have reviewed the transcripts, briefs, relevant law and Judge Bateman's opinion, and we find that Judge Bateman's opinion thoroughly and correctly disposes of the issues Smith raises on appeal. *See* Trial Court Opinion, at 13-25. Specifically, the record supports the court's determination that ordering Smith to submit to a presentence interview for the presentence investigation report did not violate Smith's Fifth Amendment privilege against self-incrimination. *See Commonwealth v. Carrillo-Diaz*, 64 A.3d 722 (Pa. Super. 2013) (first responsibility of sentencing court is to have sufficient information to enable determination of circumstances of offense and character of defendant; thus, sentencing judge must either order presentence investigation (PSI) report or conduct sufficient presentence inquiry such that, at minimum, court is apprised of particular circumstances of offense, not limited to those of record, as well as defendant's personal history and background); *see also Commonwealth v. Moore*, 583 A.2d 1 (Pa. Super. 1990), *quoting Hoffman v. United States*, 341 U.S. 479 (1951) (Fifth Amendment "protects individuals from being coerced to give testimonial evidence which would be incriminating in the sense of furnishing 'a link in the chain of evidence needed to prosecute.'").

Further, with respect to the court's sentence beyond the aggravated range of the guidelines, we point out that Judge Bateman explained his sentence in detail at the sentencing hearing. *See* Sentencing Hearing, 7/22/13, at 85-95. Judge Bateman considered the sentencing guidelines, the nature and circumstances of the offenses, the impact on the victims and their families, Smith's history and character, his rehabilitative needs, the presentence investigation and the report of a forensic psychologist. Judge Bateman also noted that this was the worst case of parasitic and exploitive behavior he had seen in thirty years and that Smith showed a complete lack of remorse, stating:

> Your life has been based upon drugs and theft and selling women. Again, quoting Dr. Shanken-Kaye, this parasitic lifestyle is something that has continued and will continue if you are not dealt with either by me or another Judge, or if by some rehabilitative setting. I don't think you're capable of changing your ways as Dr. Shanken-Kaye indicates, intensive lifetime treatment. . . . You exploited [these women]. You degraded them. I have to say, this is perhaps one of the worse cases I've been around in over 30 years as a lawyer and a judge. The exploitation and the degradation of women to the point where they were locked in a room and given their morning wake-up call for drugs. The morning wake up. They got no money. They just got drugs, and the drugs made their condition worse and worse. . . . That is how you kept them. . . . So you've demonstrated through your conduct that this is a serious offense and you have no regard and in my judgment, for anyone else, and the likelihood of you re-offending is in my judgment virtual certainty without proper treatment.

*Id*. at 92-93. We find no manifest abuse of discretion. *See Commonwealth v. Bowen*, 975 A.2d 1120 (Pa. Super. 2009).

- 5 -

With respect to Smith's claim that the court erred in failing to approve his request, prior to sentencing, for retention of a psychologist to assess his mental condition, the court notes it did approve this request at sentencing and considered the psychologist's report in determining Smith's motion for modification of sentence. With respect to his challenges to venue, the court's consolidation of the criminal informations, and the court's determination that the sexual assault and rape convictions were not against the weight of the evidence, Smith has failed to establish that Judge Bateman abused his discretion.

Accordingly, we affirm the judgment of sentence based on Judge Bateman's opinion. We direct counsel to attach a copy of the trial court opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/2015

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      No. 7731/2013
     :      4422/2012

     vs.      :

ENOCH SMITH      :

## OPINION

Defendant Enoch Smith (hereinafter "Appellant") appeals to the Superior Court of

Pennsylvania from this Court's denial of Appellant's Motion to Modify and Reconsider Sentence

as well as this Court's Denial of Appellant's supplemental post-sentence Motion for Judgment of

Acquittal entered on December 24, 2013. We file this Opinion pursuant to Pennsylvania Rule of

Appellate Procedure (Pa.R.A.P.) 1925(a).

FACTUAL AND PROCEDURAL HISTORY

In 2011, 23 year old Erin O'Connell began working for Appellant (N.T. 4/24/13, p. 7).

She testified that she was already working as a prostitute on Kensington Avenue in Philadelphia

when she met Appellant. According to Erin, Appellant would go up and down Kensington

Avenue looking for girls that were "posted up" (N.T. 4/24/13, p. 7). The girls would stand on

certain corners or specific spots on Kensington Avenue and Appellant would stop and talk to

them and let them know what he could offer if they were to work for him (N.T. 4/24/13, p. 9).

At the time Erin O'Connell encountered Appellant, she had been thrown out of her family home

due to her addiction to drugs (N.T. 4/24/13, p. 9). Appellant told Erin that he could provide her

with a place to stay, food, and clothes, if she were to work for him (N.T. 4/24/13, p. 10). Erin

decided to work for Appellant and lived at Appellant's apartment in Philadelphia on Luzerne

Street (N.T. 4/24/13, p. 11). Enoch took pictures of Erin posing in lingerie that he provided for

1

Circulated 01/15/2015 02:05 PM

Backpage ads (N.T. 4/24/13, p. 22). Backpage was an advertisement site that allowed Appellant to post provocative pictures of women with a phone number for men to call. Appellant told Erin that she would have "dates" and Erin would have to give Appellant the money from the dates. In return, he would provide her with 40% of her earnings in drugs, specifically heroin and crack (N.T. 4/24/13, pp. 12-13). Appellant also told Erin that she was not allowed to go on dates with black men because he believed they were aggressive and cheap (N.T. 4/24/13, p. 13). Erin testified that the most men she saw in a 24-hour period was 12 dates (N.T. 4/24/13, p. 14). Appellant told Erin that she was one of his highest income earners and that she "worked like a horse." (N.T. 4/24/13, p. 15). Around February or March of 2012, Appellant moved Erin and the other girls she lived with in Philadelphia to hotels in Bucks County, specifically the Ramada, Radisson, and the Knights Inn (N.T. 4/24/13, p. 15).

Erin testified that if it were a particularly slow day and she did not have any dates, her body would go through withdrawal (N.T. 4/24/13, p.18). When this occurred, she would ask Appellant for drugs and she would pay him back (N.T. 4/24/13, p. 19). Sometimes, Erin would have to pay Enoch back in sexual favors, such as oral sex or sexual intercourse (N.T. 4/24/13, p. 19). According to Erin, Appellant carried the medication "Narcon" on him, which is administered if someone was overdosing (N.T. 4/24/13, p. 21). Appellant provided Erin with syringes, pipes, lingerie, press-on nails, heels, underwear, and anything else she needed (N.T. 4/24/13, pp. 21-24). Appellant also provided the women with pre-paid phones to use when receiving calls for dates (N.T. 4/24/13, p. 30).

Janay Sheehy met Appellant in December of 2011 after being discharged from a halfway house in Philadelphia due to a heroin relapse (N.T. 4/24/13, p. 58, 66). She was nineteen years old at the time (N.T. 4/24/13, p. 59). Appellant offered Janay a ride and a place to stay on Vici

2

Street in Philadelphia (N.T. 4/24/13, p. 68,72). After Janay accepted Appellant's offer, he gave her heroin which she injected. Janay used approximately a bundle (14 bags) of heroin after meeting Appellant that first day (N.T. 4/24/13, p. 67). Appellant eventually approached Janay about prostituting for him and he agreed to provide her with food and drugs in exchange for her services (N.T. 4/24/13, pp. 69-70).

Appellant took sexually provocative photographs of Janay and advertised her services on the Internet. After having sexual intercourse with two different men on the same day, Janay informed Appellant that she no longer wished to conduct escort services (N.T. 4/24/13, p. 73). Janay testified that Appellant became angry, grabbed her arms, and pushed her against the wall of the bedroom (N.T. 4/24/13, p. 74-75). Appellant then proceeded to have forcible vaginal intercourse with her without her consent (N.T. 4/24/13, p. 75, 77).

In February of 2012, Caitlin McQuillen was introduced to Appellant while prostituting herself in the Kensington section of Philadelphia (N.T. 4/23/13, p. 180). At the time, Caitlin McQuillen was sick and experiencing withdrawal symptoms (N.T. 4/23/13, p. 181). Appellant approached Caitlin in his car and told her that he could provide her with heroin if she would work for him (N.T. 4/23/13, p. 181). Caitlin agreed to work for Appellant in exchange for drugs (N.T. 4/23/13, p. 182). When dates would come to the door, Caitlin typically was wearing just a bra and underwear or lingerie that was provided by Appellant. Appellant also provided her with condoms (N.T. 4/23/13, p. 183). Caitlin would give the money to Appellant and would receive 40% in heroin and crack in return (N.T. 4/23/13, p. 184). Caitlin preferred cocaine over crack, but she was not allowed to have cocaine because it would make her paranoid and she would pick at her face, causing scabs and scars (N.T. 4/23/13, p. 186). Appellant was upset with Caitlin when this happened because she would not be as desirable for dates (N.T. 4/23/13, p. 186).

3

Circulated 01/15/2015 02:05 PM

When working for Appellant, Caitlin prostituted herself out at the Ramada, Lincoln Motel and the Roosevelt Inn (N.T. 4/23/13, p. 197).

Shortly after leaving her family home in New Hope, Pennsylvania, in February 2012, 20 year old Lisa Guerrieri was introduced to Appellant through two friends from high school, Anna Waldron and Caitlin McQuillen (N.T. 4/23/13, p. 105). Lisa Guerrieri had already been using drugs for a period of time when she met Appellant (N.T. 4/23/13, p. 105). Appellant offered Lisa a job to work for him and told her that he worked in hotel rooms (N.T. 4/23/13, p. 107). Appellant told Lisa that she would have a place to stay and would have drugs (N.T. 4/23/13, p. 107). Lisa began working for Appellant the day after she met him and she was given heroin that same day to feed her addiction (N.T. 4/23/13, p. 107). Appellant provided her with lingerie and took photos of her. The photos were placed on Backpage where "johns" could look up women and call for dates (N.T. 4/23/13, p. 108). Appellant took the photos with his cellphone (N.T. 4/23/13 p. 108). Men that saw the posts on Backpage would contact the women through a pre-paid phone that Appellant provided (N.T. 4/23/13, p. 109).

When Lisa Guerrieri received a phone call from a "date,"[1] the date would come to her hotel room, give her money, and she would perform sexual activities, and then the date would leave (N.T. 4/23/13, pp. 111-112). Appellant had provided a set of rules for the women to follow when they were on a date, such as making sure the men were comfortable and that the men were not law enforcement (N.T. 4/23/13, p. 112). Appellant also told the women to only accept dates from white men because they were more likely to pay (N.T. 4/23/13, p. 112). The money that the women received from their dates was given to Appellant (N.T. 4/23/13, p. 113). In exchange for the dates they had, Appellant provided the women with drugs (N.T. 4/23/13, p. 114). It cost

---

[1] A date was the word used to describe when a "john" would call one of women from the site Backpage and come to the hotel.

4

Circulated 01/15/2015 02:05 PM

$120 for a half hour with the women and $160 for a full hour. All of these proceeds would go to Appellant (N.T. 4/23/13, p. 114).

If there was a particularly slow day, where Lisa Guerrieri was not receiving any phone calls or scheduling dates, she was usually sick and experiencing withdrawal symptoms (N.T. 4/23/13, p. 115). She would ask Appellant for more drugs, and he would respond that she was a "fucking junkie" (N.T. 4/23/13, p. 116). If Lisa was unable to earn her pay in drugs by setting up dates, Appellant would make her have sex with him in order to receive the drugs (N.T. 4/23/13, p. 117). Lisa Guerrieri would usually use about a bundle of heroin (10 to 12 bags) a day intravenously (N.T. 4/23/13, p. 121). In the morning, Appellant would provide her with a "wake up" of three bags of heroin and a couple of crack rods (N.T. 4/23/13, p. 122). She would not have been able to work if she was experiencing the withdrawal symptoms (N.T. 4/23/13, p. 123). Appellant also provided Lisa Guerrieri with condoms, drug paraphernalia, such as needles, and lingerie (N.T. 4/23/13, p. 126).

When working for Appellant, Lisa Guerrieri prostituted herself out of several hotels, including the Ramada, the Radisson, the Neshaminy Inn, and the Red Roof Inn, all of which are located in Bucks County (N.T. 4/23/13, p. 120). According to Lisa, Appellant moved the women from different hotels so that it was not obvious what they were doing in the hotel rooms (N.T. 4/23/13, p. 121). David Ronan was Appellant's "muscle" and would stay with the women in the rooms (N.T. 4/23/13, p. 129). David Ronan was also an addict and used heroin (N.T. 4/23/13, p. 130). Lisa testified that Appellant never ingested drugs (N.T. 4/23/13, p. 130).

On March 26, 2012, Officer Gansky of the Bensalem Township Police Department received a complaint from the Neshaminy Motor Inn on the Route 1 Corridor in Bensalem Township (N.T. 4/23/13, p. 54). The complaint was in reference to prostitution activity in one of

5

Circulated 01/15/2015 02:05 PM

the rooms at the Inn (N.T. 4/23/13, p. 54). After receiving the complaint, Officer Gansky met with hotel personnel and investigated room 317 at the Neshaminy Motor Inn for any suspicious activity (N.T. 4/23/13, p. 56). Upon arriving at room 317 with Officer Gregory Smith, Officer Brady, and Special Agent Gallant, Officer Gansky knocked on the door of 317 and was met by a white female, later identified as Lisa Guerrieri (N.T. 4/23/13, p. 57). Officer Gansky explained to Lisa Guerrieri that the officers had received a complaint and asked if they could come inside to speak to her (N.T. 4/23/13, p. 57). When Lisa Guerrieri opened the door to allow the Officers inside, she ran to the bed in an effort to hide heroin needles and heroin bags (N.T. 4/23/13, p. 57). Officer Gansky noticed that Lisa Guerrieri had a purse that also contained five bags of heroin, four bags of crack, as well as used needles, baggies, Chore Boy, and tin cans (N.T. 4/23/13, p. 57). According to Officer Gansky, a Chore Boy is used for a crack pipe. It is metal wiring that prevents crack from coming into the mouth so that only smoke is filtered through. (N.T. 4/23/13, p. 58).

Officer Gansky and the other officers with him at the time seized the drugs from Lisa Guerrieri and sent the drugs to be tested in a lab. The officers informed Lisa Guerrieri that they were going to wait a few hours until the source of the drugs, Appellant, returned to the Inn, and Lisa agreed to contact the officers when Appellant returned (N.T. 4/23/13, p. 61). Officer Gansky also informed Lisa Guerrieri that she would be charged via summons (N.T. 4/23/13, p. 66). A few hours after the initial knock and talk with Lisa Guerrieri, Lisa Guerrieri contacted Officer Gansky and stated via text message that Appellant had returned to the hotel room. Officer Gansky and the other officers in the unit then responded back to the hotel and conducted a second knock and talk investigation (N.T. 4/23/13, p. 62).

Upon returning to Room 317, Officer Gansky knocked on the door, and Appellant

6

Circulated 01/15/2015 02:05 PM

answered, wearing only boxers (N.T. 4/23/13, p. 62). Lisa Guerrieri was on the bed and was wearing a tank top and underwear. Appellant allowed the officers to search the room as well as his vehicle, a silver Mercury with silver rims (N.T. 4/23/13, p. 63). The officers found several hundred dollars in Appellant's pants, but no drugs were found on him (N.T. 4/23/13, p. 63). At the conclusion of Officer Gansky's investigation at the Neshaminy Motor Inn, Officer Gansky contacted Lisa Guerrieri's parents to let them know about Lisa's drug activity (N.T. 4/23/13, p. 64). Lisa Guerrieri's parents informed Officer Gansky that they had been trying to find Lisa for weeks (N.T. 4/23/13, p. 64).

On this same day, Officer Smith, who had responded to the Neshaminy Motor Inn with Officer Gansky, had learned of another room, Room 303, which had also been suspected of prostitution type activity (N.T. 4/23/13, p. 76) When Officer Smith knocked on the door of Room 303 with Special Agent Gallant, David Ronan answered the door (N.T. 4/23/13, p. 76). David Ronan was working for Appellant at the time. Officer Smith advised David Ronan that he was there to investigate possible prostitution activity and asked David Ronan whether he had any drug paraphernalia in the room (N.T. 4/23/13, p. 76). David Ronan gave the Officers consent to search the room and pills and heroin paraphernalia, such as baggies from used heroin and hypodermic needles, were recovered (N.T. 4/23/13, p. 76).

On April 1, 2012, Officer Dennis Hart, of the Bensalem Township Police Department, responded to the Red Roof Inn for investigation of prostitution in two rooms, rooms 164 and 174 (N.T. 4/23/13, p. 80). Officer Hart had received information that a black male rented rooms for two days and had at least two women in each room (N.T. 4/23/13, p. 80). Officer Hart was also given information regarding a vehicle to look out for during the investigation. After arriving at the Red Roof Inn, Officer Hart went to the south side of the hotel and found a silver Mercury

7

Circulated 01/15/2015 02:05 PM

Marquis with chrome wheels (N.T. 4/23/13, p. 81). It was the vehicle that had been reported by the hotel staff (N.T. 4/23/13, p. 81). Officer Hart ran the tag on the vehicle and it came back to Appellant.

Two days later, on April 3, 2012, Officer Smith received another complaint in reference to possible prostitution activity from management at the Red Roof Inn. Two separate rooms, rooms 170 and 172, were investigated (N.T. 4/23/13, p. 86). Upon arriving at the scene, Officer Smith observed the silver Marquis he believed belonged to Appellant pull out of the parking lot (N.T. 4/23/13, p. 89). During Officer Smith's investigation, he learned that the rooms were rented to Appellant and Lisa Guerrieri (N.T. 4/23/13, p. 86). Officer Smith went to investigate the rooms with management (N.T. 4/23/13, p. 87). Management knocked on the doors and advised the occupants that they needed to leave (N.T. 4/23/13, p. 87). Lisa Guerrieri opened the door to room 170 and Officer Smith observed in plain view numerous drug paraphernalia (N.T. 4/23/13, p. 87). Officer Smith asked Lisa Guerrieri if she could contact Appellant so that he would return to the Red Roof Inn location. Lisa Guerrieri called Appellant and placed the phone on speakerphone. Officer Smith testified that he could hear a male voice on the other end and that the male voice was yelling at Lisa because she did not make enough money for him that day and he was not coming back (N.T. 4/23/13, p. 89).

After talking with Lisa Guerrieri, Officer Smith walked over with management to room 172 where he was met by Jessica O'Donnell and David Ronan (N.T. 4/23/13, p. 87). Officer Smith noticed a hypodermic needle sticking out of Jessica O'Donnell's purse on the bed. After observing Lisa Guerrieri, Jessica O'Donnell, and David Ronan, Officer Smith believed that they were under the influence of drugs (N.T. 4/23/13 p. 88). They were very lethargic, moved slowly, and it took some time for them to respond to questions (N.T. 4/23/13, p. 88). Jessica O'Donnell

8

Circulated 01/15/2015 02:05 PM

and Lisa Guerrieri were taken into custody at this time for possession of drugs and drug paraphernalia (N.T. 4/23/13, p. 90, 135). Appellant was not arrested at this time but the investigation continued regarding the prostitution ring (N.T. 4/23/13, p. 94).

Officer Smith continued to investigate the Back Page web site and tried to locate the women listed on the site. Specifically, Officer Smith testified that he would often visit Kensington Avenue since it was the location where other females involved in the investigation had met Appellant (N.T. 4/24/13, p. 95). While conducting the investigation, Officer Smith was in contact with Wendy Newton, a prostitute, who had information on Appellant and his whereabouts (N.T. 4/24/13, p. 96). When he was in contact with Wendy Newton, there was an active warrant out for Appellant (N.T. 4/24/13, p. 97). Wendy Newtown informed Officer Smith that she had a phone number for Appellant and that she could contact him and he would meet her since she used to work for him (N.T. 4/24/13, p. 98). Officer Smith had Wendy Newtown place a phone call to Appellant and she gave Appellant a specific location to meet her so that Officer Smith would be able to take him into custody. (N.T. 4/24/13, p. 98). Officer Smith contacted the Philadelphia Police Department to assist in the arrest. (N.T. 4/24/13, p. 99)

Approximately fifteen minutes after Ms. Newton placed the phone call to Appellant, Appellant arrived at the location in his Grand Marquis with chrome rims (N.T. 4/24/13, p. 99). Appellant was taken into custody by several members of law enforcement soon after his arrival, and his vehicle was inventoried and brought back to Bensalem Township Police Department Headquarters (N.T. 4/24/13, pp. 99-102). A search warrant was then issued (N.T. 4/24/13, p. 104). During the inventory of Appellant's vehicle, nothing was seized (N.T. 4/24/13, p. 137). Pursuant to the search warrant, a trash bag with women's clothes and lingerie were recovered from the trunk of the vehicle, as well as a bag of condoms, several new needles and other drug

9

Circulated 01/15/2015 02:05 PM

paraphernalia (N.T. 4/24/13, p. 138). According to Officer Smith, there were at least a hundred new condoms (N.T. 4/24/13, p. 139). Officer Smith also recovered rubber ties, vials of distilled water, and cotton balls (N.T. 4/24/13, p.139). Cell phones and a white Dell laptop were also recovered from the vehicle and secured as evidence (N.T. 4/24/13, p. 139). Approximately $512 was removed from Appellant when he was arrested (N.T. 4/24/13, p. 140).

Following a pre-trial hearing held on March 27, 2013, this Court granted the Commonwealth's Motion to Consolidate Criminal Information's 4422 of 2012[2] and 7731 of 2012[3] on April 11, 2013. Following a jury trial held on April 22 through April 25, 2013, Appellant was found guilty of all charges.[4] On July 22, 2013 Appellant was sentenced to not less than ten years nor more than twenty years of incarceration on the charge of rape by forcible compulsion, and a consecutive sentence of not less than three and one half nor more than seven years incarceration on the charge of promoting/encouraging prostitution on criminal information number 7731 of 2012. Appellant was sentenced to not less than ten years nor more than twenty years incarceration on the charge of corrupt organizations, not less than three and one half nor more than seven years consecutive incarceration on the charge of promoting prostitution/procuring inmate for house of prostitution, not less than three and one half nor more

_____

[2] On Criminal Information number 4422 of 2012, the Commonwealth charged Appellant with Corrupt Organizations, Promoting Prostitution, Delivery of a Controlled Substance, and related crimes. The allegations involved the Appellant running an ongoing prostitution and drug delivery ring.

[3] On Criminal Information number 7731 of 2012, the Commonwealth charged Appellant with Promoting Prostitution, Forcible Rape, and related crimes. The allegations stem from the forcible rape of a young female that Appellant recruited to prostitute for him. The forcible rape occurred after the victim refused to continue to prostitute herself for the Appellant.

[4] *See* Verdict Sheet. Appellant was found guilty of Rape by Forcible Compulsion or Threat of Forcible Compulsion (18 Pa.C.S. §3121(a)(1)), Promoting Prostitution as Owner of House of Prostitution (18 Pa.C.S. §5902 (b)(1)), two counts of Promoting Prostitution by Procuring an Inmate (18 Pa.C.S. §5902 (b)(2), two counts of Promoting Prostitution – Encouraging Prostitution (18 Pa.C.S. §5902 (b)(3)), Criminal Use of a Communication Facility (18 Pa.C.S. §7512 (a)), five counts of Delivery of a Controlled Substance (35 P.S. 780-113(a)(30)), Conspiracy to Promote Prostitution (18 Pa.C.S. §903 (c)), and Corrupt Organizations (18 Pa.C.S. §911 (b)(3)).

10

Circulated 01/15/2015 02:05 PM

than seven years consecutive incarceration on the charge of promoting prostitution/encouraging prostitution, not less than three years nor more than six years consecutive incarceration on the charge of manufacture, delivery or possession with intent to manufacture or deliver a controlled substance, and not less than three years nor more than six years consecutive incarceration on the charge of manufacture, delivery or possession with intent to manufacture or deliver a controlled substance on criminal information number 4422 of 2012. This Court further ordered that the sentences imposed on criminal information numbers 7731 and 4422 of 2012 were to run consecutively to each other.

On July 31, 2013, a Motion for Modification of Sentence was filed by Appellant. A hearing was held on September 6, 2013 and was continued until December 17, 2013.[5] This Court subsequently denied Appellant's Motion to Reconsider Sentence on December 24, 2013. On January 21, 2014, Appellant filed a Notice of Appeal to the Superior Court. On January 23, 2014, Appellant was directed to file a Concise Statement of Matters Complained of on Appeal. On February 3, 2014, Appellant filed a Petition for an Extension of Time to File a Statement of Matters Complained of on Appeal. On February 5, 2014, this Court granted Appellant's Petition for Extension. On March 6, 2014, Appellant filed his Statement of Matters Complained on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Pa.R.A.P.) 1925(a).

MATTERS COMPLAINED OF ON APPEAL

On March 6, 2014 Defendant filed his Statement of Matters Complained of on Appeal, raising the following issue, *verbatim*:

1.  Whether the sentencing court erred as a matter of law/abused its discretion by improperly considering and failing to disregard in total a pre-sentence investigation

---

[5] We note that after this Court stated its' reasons for denying Appellant's Motion for Reconsideration of Sentence, Appellant responded, "Yeah, fuck you too." (N.T. 12/17/13, p. 22).

11

Circulated 01/15/2015 02:05 PM

report produced from Bucks County Adult Probation wherein the conclusions and averments in the report were tainted by the inclusion of an interview with the Appellant conducted in violation of his privilege against self-incrimination guaranteed under the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution?

2. Whether the sentencing court erred as a matter of law/abused its discretion in declining to approve the Appellant's pre-sentence request for the retention of a forensic psychologist/psychiatrist expert to assess the Appellant's current mental condition, mental health considerations in sentencing, drug and alcohol assessment, drug and alcohol considerations in sentencing, psychosocial history, educational history, vocational history, the Appellant's potential for rehabilitation, and to re-but the pre-sentence investigation and SVP report relied upon by the Court in imposing sentence.

3. Whether the trial court erred as a matter of law/abused its discretion in granting the Commonwealth's Motion to Consolidate Information number 4422 of 2012 and 7731 of 2012.

4. Whether the trial court erred as a matter of law in denying the Appellant's pre-trial objection to venue in Criminal Information number 7731 of 2012.

5. Whether the trial court erred as a matter of law/abused its discretion in denying the Appellant's post-sentence motion for judgment of acquittal or new trial on the grounds that the verdict of guilt as to the charges of rape by forcible compulsion and sexual assault was against the weight of the evidence as the convictions improperly rested upon the contradictory and uncorroborated testimony of Commonwealth witness J.S.

12

Circulated 01/15/2015 02:05 PM

6. Whether the sentencing court's imposition of an aggregate sentence of not less than forty years nor more than eighty years incarceration on Information numbers 4422 of 2012 and 7731 of 2012 was unreasonable and manifestly excessive in that the aggregated sentences exceeded the aggravated range of sentencing and violated the fundamental norms of sentencing in that the sentencing court failed to properly consider the rehabilitative needs of the Appellant under 42 Pa. C.S.A. 9721(b).

ANALYSIS

**A. Fifth Amendment Privilege**

The standard of review for a claim challenging a discretionary aspect of sentencing is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived at a manifestly unreasonable decision. Commonwealth v. Shugars, 894 A.2d 1270, 1275 (Pa.Super. 2006).

When reviewing sentencing matters, great weight must be given to the sentencing court as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime. Commonwealth v. Fries, 523 A.2d 1134 (Pa. Super. 1987), allocator denied, 531 A.2d 427 (Pa. 1987). The Superior Court has emphasized that a trial court must not delegate its sentencing decision to any person or group and instead, "sentencing must result both from a consideration by the trial judge of the nature and circumstances of the crime as well as the character of the defendant. Commonwealth v. Devers, 519 Pa. 88, 92 (1988).

13

Circulated 01/15/2015 02:05 PM

Appellant contends that the trial court erred in ordering him to submit to a pre-sentence interview[6], arguing that he should not be the source of the information that is used in sentencing. Appellant states that he should have been allowed to exercise his Fifth Amendment right not to incriminate himself. We believe that Appellant misconstrues the scope of the Fifth Amendment privilege.

The Fifth Amendment privilege against self-incrimination "protects individuals from being coerced to give testimonial evidence which would be incriminating in the sense of furnishing 'a link in the chain of evidence needed to prosecute.'" Commonwealth v. Moore, 400 Pa.Super 151, 153 (1990), *quoting* Hoffman v. United States, 341 U.S. 479 (1951). In addition, in Commonwealth v. Travaglia, 502 Pa. 474, 499 (1983), the Supreme Court of Pennsylvania found that the "privilege against self-incrimination in it pure form has no direct application to a determination of the proper sentence to be imposed." The Court reasoned that the sentencing phase of the trial has a different purpose than the guilt phase.

In Commonwealth v. Moore, the trial court directed that the Appellant cooperate with the Probation Department so that they would be able to prepare a pre-sentence report. Specifically, the trial court informed the Defendant:

> "Mr. Moore, I don't know very much about you, and before I impose sentence in a case like this, I want to have a presentence investigation, and a presentence report. I think it's to your benefit that the Court have all the information available to it, or that can reasonably be made available to it…I hereby direct that you cooperate with the Probation Department, that you talk to the Probation Officer for the purpose of having a presentence report prepared." (N.T. March 20, 1989 at 3-4, Commonwealth v. Moore, 400 Pa.Super 151, 153 (1990), footnote 3).

In the instant case, Appellant's Counsel, Keith McAndrews, had informed the Probation Department that Appellant was not going to participate in an interview for purposes of the pre-

---

[6] Pursuant to Pennsylvania Rule of Criminal Procedure 702(a)(1) a pre-sentence investigation report was ordered. The trial court has discretion to order such report so that it can "actively explore the Defendant's character and potential response to rehabilitation programs." Commonwealth v. Kelly, 33 A.3d 638, 641 (Pa. Super. 2011).

14

Circulated 01/15/2015 02:05 PM

sentence investigation. However, the report indicated that Appellant was interviewed, and the report allegedly included specific references to another pending matter in Philadelphia County. However, the trial court indicated that Appellant voluntarily continued to speak. Moreover, the trial court stated:

> "If you want me to disregard what he had to say, that's a separate issue. Frankly, I've read it, and I'm not going to consider anything about pending charges. But everything else seems to be fairly consistent with his testimony at trial. For what it's worth, I'm not going to consider anything in the report. But you are right, he should not have been questioned about pending charges. I'm not sure he was questioned, as much as he volunteered the information." (N.T. 7/22/13 pp. 66-67).

Although Appellant argues that his Fifth Amendment privilege was violated, we find that Appellant's argument is without merit. We indicated to both Appellant and Appellant's Counsel that we were disregarding any statements made about pending charges. Moreover, for purposes of imposing sentence, the Supreme Court of Pennsylvania has found that the privilege against self-incrimination has no direct application when imposing sentence. Therefore, we find that Appellant failed to demonstrate that his Fifth Amendment Privilege was violated.

## B. Denial of Pre-Sentence Request

Although Appellant argues that the trial court erred as a matter of law in declining to approve the Appellant's pre-sentence request for the retention of a psychologist to assess Appellant's mental condition, this Court did approve this report to be made on Appellant's behalf.[7] However, as is reflected on the record at Appellant's Motion for Reconsideration of Sentence hearing, Counsel for Appellant chose not to introduce this report on the record. Specifically, when asked by this Court whether the assessment was completed and whether the

---

[7] On the day of sentencing, Appellant requested a continuance in order to retain a psychologist to assess his mental condition. The request for a continuance was denied. However, an evaluation was permitted and was to be considered should Appellant seek reconsideration of sentence.

15

Circulated 01/15/2015 02:05 PM

Court was correct in its belief that Counsel chose not to introduce any evidence of the report, Appellant's Counsel stated:

> "Your Honor, that's correct. There was approval, I had requested a mitigation expert to rebut to some extent Dr. Shanken-Kaye's report, and the pre-sentence investigation, and I also asked separately for funds for an SVP expert... Normally I wouldn't introduce that into the record, but under the circumstances procedurally, I felt that I had an obligation to advise the Court that I had contacted him and that I had consulted with him in the event that there was testimony that could be used for Appellant's sentencing on behalf of the Appellant..." (N.T. 12/17/13, pp. 2-4).

We find that Appellant's argument lacks merit as this Court did approve a pre-sentence request on behalf of Appellant, but Appellant's Counsel chose not to introduce any of this evidence.[8]

### C. Consolidation of Criminal Informations

Appellant next contends that the trial court erred as a matter of law in granting the Commonwealth's Motion to Consolidate Informations number 4422 of 2012 and 7731 of 2012. On Criminal Information number 4422 of 2012, the Appellant was charged and subsequently found guilty of Corrupt Organizations, Promoting Prostitution, Delivery of a Controlled Substance and related crimes. The allegations involved Appellant running an ongoing prostitution and delivery ring. On Criminal Information 7731 of 2012, the Commonwealth charged the Appellant with Promoting Prostitution, Forcible Rape, and related crimes. The allegations stemmed from the forcible rape of a young female that the Appellant recruited to prostitute for him.

The joinder of separate indictments or informations for trial is governed by Rule 582 of the Pennsylvania Rules of Criminal Procedure. The rule provides:

---

[8] We also find Appellant's request for a pre-sentence psychological report inconsistent with his claim that a pre-sentence investigation report should not have been ordered. In effect, Appellant has chosen the circumstances he will participate in various evaluations.

16

Circulated 01/15/2015 02:05 PM

(A) Standards

Offenses charged in separate indictments or Informations may be tried together if:
(a) The evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) The offenses charged are based on the same act or transaction

"Whether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." Commonwealth v. Newman, 528 Pa. 393, 398 (1991). While evidence of prior crimes or bad acts is generally not admissible if offered merely to show a defendant's bad character or propensity to commit a crime, it is well settled that where such evidence is proffered for some relevant purpose other than to show criminal propensity or bad character, such evidence is admissible, subject to the probable value or prejudicial effect that attends all rulings on admissibility. Commonwealth v. Richter, 551 Pa. 507, 512 (1998). In addition, "evidence of other crimes may be introduced where such evidence was part of the chain or sequence of events which became part of the history of the case in question and formed part of the natural development of the facts." Commonwealth v. Spotz, 562 Pa. 498, 523 (2000), citing Commonwealth v. Lark, 518 Pa. 290 (1988). In Commonwealth v. Spotz, the admissibility of the prior crimes evidence was the subject of a pre-trial evidentiary motion. The trial court found that the other crimes "were part of a chain of events which formed the history of the case and were part of its natural development." Commonwealth v. Spotz, 562 Pa. 498, 523 (2000).

In the instant case, the Commonwealth argued at a pre-trial hearing before the Honorable Diane E. Gibbons of this Court that the evidence of each of the offenses would be admissible in

17

Circulated 01/15/2015 02:05 PM

separate trials for one another. Moreover, the evidence would be offered to show motive, intent, and common scheme, plan and design, and the identity of the Appellant. The Commonwealth also argued that the facts supporting the Forcible Rape allegations and the fact supporting the Corrupt Organization, Promoting Prostitution, and related charges are all part of the natural development of the history of the case. Specifically, at the pre-trial hearing, the Commonwealth argued:

> "Your Honor, the same analysis would be, the one that we would use in determining a prior bad act analysis. The facts that we have are part of the natural development of the case. To preclude the rape aspect of the Philadelphia Vicci Street prostitution event would completely change the context of what really occurred. You would essentially just have the facts that for one 24 hour period or less than 24 hours at the defendant's direction, a young woman performed two sexual acts for money…I think even those elements in promoting prostitution would be impacted if you took out the fact of the sexual assault. I think there is no doubt that that would show that he encouraged her, he induced her to perform acts of prostitution that would cause her to remain a prostitute. But when she [Janay Sheehy] refused, he [Appellant] then engaged in a sexual act. The analysis I take on it is because she was indebted to him. I think it is so intertwined in the actual act of promoting prostitution that if you took that fact out of the case, it would change the development of the case, the history of the case, and the facts wouldn't make sense if you took out that aspect of the case." (N.T. 3/27/13, pp.70-71).

This Court found that the relation of the separately charged crimes described remarkably similar occurrences. The similarities between the victims and the manner in which they were victimized by Appellant were sufficient to constitute not only a common plan or scheme, such that evidence of each would be admissible in separate trials, but that the related charges were all part of the natural development and history of the case against Appellant. Judge Gibbons found that the prostitution ring carried out by Appellant showed motive for the rape and in turn, the rape showed motive for the prostitution. Therefore, the conduct of having forcible sexual intercourse with the victim, Janay Sheehy, in response to her refusing to continue to work for Appellant, was evidence that strongly supports not only Appellant's intent, but the chain or sequence of events which became part of the history of the case against Appellant.

18

Circulated 01/15/2015 02:05 PM

## D. Pre-Trial Objection to Venue

Appellant next argues that the trial court erred as a matter of law in denying the Appellant's pre-trial objection to venue in Criminal Information number 7731 of 2012, arguing that the alleged conduct that formed the basis of the charges occurred in Philadelphia, not Bucks County. It would appear that Appellant believes that a criminal court lacks jurisdiction to try an offense that did not occur within that county, as the basis for his lack of jurisdiction claim. However, the Pennsylvania Supreme Court Case of Commonwealth v. McPhail, 692 A.2d 139 (1997), made clear that all charges stemming from a single criminal episode should be heard in a single trial, despite the fact that some of the charges may have arisen in more than one judicial district. The Court determined that there is no constitutional deprivation occasioned by joining all charges stemming from a single criminal episode for trial in one county despite the fact that some of the charges arose in a different county. McPhail, 692 A.2d at 145. To implement the holding in McPhail, Rule 130 was added to the Pennsylvania Rules of Criminal Procedure. The Rule states in pertinent part:

Rule 130. Venue; Transfer of Proceedings

(A) Venue. All criminal proceedings in summary and court cases shall be brought before the issuing authority for the magisterial district in which the offense is alleged to have occurred or before an issuing authority on temporary assignment to serve such magisterial district, subject, however, to the following exceptions:

...

(3) When charges arising from the same criminal episode occur in more than one judicial district, the criminal proceeding on all the charges may be brought before one issuing authority in a magisterial district within any of the judicial districts in which the charges arising from the same criminal episode occurred. Pa.R.C.P. 130.

19

Circulated 01/15/2015 02:05 PM

In McPhail, the Court was faced with the issue as to whether certain offenses were properly within the jurisdiction of a single court. 692 A.2d at 141. Following an analysis of common law principles regarding jurisdiction coupled with constitutional principles and the dictates of the then-existing provisions of 18 Pa.C.S. § 110, it was held that "there is no constitutional deprivation occasioned by joining all charges stemming from a criminal episode for trial in one county despite the fact that some of the charges arose in a different county." Id. at 144-45.

However, the legislature later amended 18 Pa.C.S. § 110(1)(ii), which effectually superseded the former portion of the statute and limited the holding of McPhail. The Pennsylvania Supreme Court interpreted "that such amendment was 'intended to preclude from the reach of the compulsory joinder statute those current offenses that occurred wholly outside of the geographic boundaries of the judicial district in which the former prosecution was brought, *even though part of a single criminal episode.*'" Commonwealth v. Reed, 990 A.2d 1158, 1163 (Pa. 2010). See generally Commonwealth v. Fithian, 961 A.2d 66 (Pa. 2008). Despite this, the term "McPhail letter" remains common legal vernacular regarding cases involving a continuing criminal episode.

The Commonwealth argued that the events which took place in both Philadelphia and Bucks Counties constituted an ongoing criminal episode. Accordingly, the central question remains whether the charges in these cases arose from the "same criminal episode."

The test fashioned by the court in order to determine whether offenses charged arose from the same criminal episode is well-settled. The two factors to be considered are as follows: "(1) the logical relationship between the acts and (2) the temporal relationship between the acts."

20

Circulated 01/15/2015 02:05 PM

Commonwealth v. Bracalielly, 658 A.2d 755, 761 (Pa. 1995), citing Commonwealth v. Hude, 458 A.2d 177, 183 (Pa. 1983). Notably,

> The interpretation of the term 'single criminal episode' must not be approached from a hyper-technical and rigid perspective which defeats the purposes for which it was created. Thus, where a number of charges are logically and/or temporally related and share common issues of law and fact, a single criminal episode exists, and separate trials would involve substantial duplication and waste of judicial resources...

Bracalielly, 658 A.2d at 761, citing Hude, 458 A.2d at 183. For the offenses to be logically related, there must be a "substantial duplication of factual and/or legal issues presented by the offenses." Commonwealth v. Wittenburg, 710 A.2d 69, 74 (Pa. 1998), citing Bracalielly, 658 A.2d at 761.

In the case at hand, this Court found that the charges deriving from Criminal Information 7731 of 2012 and Criminal Information 4421 of 2012 comprised a single criminal episode as defined by case law, thereby justifying the Commonwealth's choice if venue. Both Complaints against Appellant involve promoting prostitution and the pattern and conduct of activity that Appellant chose in order to run his enterprise. The testimony elicited from Janay Sheehy indicates Appellant's pattern of prostituting vulnerable women as well as his conduct when one refused to participate in his scheme. In addition, when Bucks County convened a grand jury investigation and identified the scope and breadth of Appellant's enterprise, Appellant was then charged with corrupt organization in addition to promoting prostitution and drug delivery. Through that same investigative grand jury, Bucks County identified the forcible rape of Janay Sheehy. Furthermore, Appellant never once indicated how he would be prejudiced by this choice in venue. We find that Appellant's argument lacks merit and that the choice of venue was proper, given the substantial duplication of facts and law involved in both cases.

**E. Motion for Acquittal**

21

Circulated 01/15/2015 02:05 PM

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases where the Commonwealth has failed to carry the burden regarding that charge. Commonweath v. Feathers, 442 Pa. Super. 490 (1995). It is for the fact finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness' testimony. Commonwealth v. Adams. 882 A.2d 496, 499, (Pa. Super. 2005).

Herein, this Court was free to accept J.S.'s characterization of what transpired between her and Appellant, particularly her representation that Appellant forced himself on her when she refused to work for him. In Commonwealth v. Charlton, 902 A.2d 554, 562 (Pa. Super. 2006), the Superior Court held that "the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant." We find that J.S's testimony was sufficient evidence for the jury, sitting as the fact finder and examining the evidence in its totality, to conclude that Appellant was guilty of rape by forcible compulsion and sexual assault. 442 Pa. Super. 490

### F. Imposition of Sentence

The standard of review in sentencing matters was set forth in detail in Commonwealth v. Walls, 926 A.2d 957 (Pa. 2007):

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived at a manifestly unreasonable decision. Commonwealth v. Shugars, 894 A.2d 1270, 1275 (Pa.Super. 2006).

22

Circulated 01/15/2015 02:05 PM

In order to constitute an abuse of discretion, a sentence must either exceed statutory limits or be manifestly excessive. Commonwealth v. Casuccio, 454 A.2d 621 (Pa. Super. 1982). A claim of excessiveness *may* raise a substantial question where an appellant provides a plausible argument that the sentence is contrary to the Sentencing Code or the fundamental norms underlying the sentencing process. Commonwealth v. Mouzon, 571 Pa. 419, (2002). When reviewing sentencing matters, great weight must be given to the sentencing court as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime. Commonwealth v. Fries, 523 A.2d 1134 (Pa. Super. 1987), allocator denied, 531 A.2d 427 (Pa. 1987).

When imposing a sentence, the trial court is required to consider the sentence ranges set forth in the Sentencing Guidelines. Commonwealth v. Yuhasz, 923 A.2d 1111, 1118 (Pa. 2007). However, the trial court may deviate from the recommended guidelines; they are "merely one factor among many that the court must consider in imposing a sentence." Yuhasz, 923 A.2d at 118. A court may depart from the guidelines "if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community." Commonwealth v. Eby, 784 A.2d 204, 206 (Pa.Super. 2001).

A sentencing court may impose upon a defendant a sentence outside of the ranges prescribed by the Sentencing Guidelines so long as the Court provides a contemporaneous written statement setting forth the reasons for the deviation. 42 Pa. C.S.A. 9721(b); Commonwealth v. Walls, 926 A.2d 957 (Pa. 2007). The contemporaneous writing requirement is satisfied when the sentencing court states its reasons on the record in the defendant's presence. Commonwealth v. Ritchey, 779 A.2d 1183 (Pa. Super. 2001).

23

Circulated 01/15/2015 02:05 PM

In the present case, Appellant argues that the trial court failed to properly consider the rehabilitative needs of the Appellant. For Criminal Information 7731 of 2021, the sentencing guidelines for the Rape charge recommended a sentence of 84 to 102 months in the standard range, 72 mitigated, and 114 in the aggravated, based upon an offensive gravity score of 12. For Promoting Prostitution, the guidelines recommended a sentence in the standard range of 12 to 18 months, aggravated range of 21, and nine in the mitigated range.[9] For Criminal Information 4422 of 2012, the guidelines recommended a sentence of 18 months in the mitigated, 27 to 33 in the standard, and four to two in the aggravated for the charge of Corrupt Organization. On each of the Promoting Prostitution counts, the guidelines recommended nine in the mitigated range, 12 to 18 in the standard, and 21 in the aggravated. On the Criminal Use of a Communication Facility charge, the guidelines recommended a sentence of nine months in the mitigated, 12 to 18 in the standard, and 21 in the aggravated. On the possession with intent to deliver charge, there are two counts, which each recommended a sentence of 15 months in the mitigated, 21 to 27 in the standard, and 33 in the aggravated.[10] In total, Appellant was sentenced to a period of not less than 40 years nor more than 80 years in a State Correctional Institution.

While Appellant argues the sentence imposed by this Court was unreasonable and manifestly excessive, it is apparent from the record that this Court took into account all necessary factors to reach the appropriate sentence. While imposing the Appellant's sentence, this Court

---

[9] On Criminal Information 7731 of 2012, Appellant was ultimately sentenced to undergo imprisonment for a period of not less than ten nor more than 20 years on Count One. Appellant was sentenced for a period of not less than three and a half nor more than seven years on the promoting and encouraging prostitution charge, Count Three. The sentence was consecutive and not concurrent to the sentence imposed on Count One. No sentence was imposed on Count Two or Four.

[10] On Criminal Information 4422 of 2012, Appellant was ultimately sentenced for a period not less than ten nor more than 20 year on Count One, Corrupt Organization. The sentence was consecutive to and not concurrent with the sentence imposed on Criminal Information 7731 of 2012. On Counts Two, Three and Four, the sentence on each was not less than three and a half, nor more than seven years. The sentences were consecutive with one another, not concurrent, and were to be consecutive to Count One. On Count 9 and Count 14, possession with intent to deliver, Appellant was sentenced to a period of not less than three, nor more than six years, which was to run consecutive to and not concurrent with the other sentence imposed.

24

Circulated 01/15/2015 02:05 PM

gave a lengthy explanation as to why this particular sentence was being imposed on the record.

The stated reasons were given as follows:

"Mr. Smith, you should understand that there are a lot of things I need to consider when imposing sentence. First of all the nature and the circumstances of the offense...this is not just a rape case. This is a Corrupt Organization case which is in some ways a prostitution ring or a house of prostitution. It also involves use of drugs. In fact, drugs was the tool for your trade in which you accomplished much of what you did. And it's a forcible rape. A rape upon a woman who you took advantage of. As I recall from the testimony, she didn't want to participate in prostitution and you told her that she owed you, because you had given her some drugs...I have to take into consideration the history and the nature or character of the defendant. You have a number of prior convictions. You have what I consider to be a complete and total lack of remorse...You denied everything and you tried to present yourself as the victim and that you were misinterpreted, that you tried to help these young women. There's nothing further from the truth. You exploited them and you did it for profit...What's really significant for me is the lack of ability to conform your conduct, even while in institution...I also have to take into consideration the impact this had upon the particular victims in the case...So you see Mr. Smith, your conduct affects not just the victim herself, but the victim's family. All of these families were affected by what you did...And then of course I have to consider the sentencing guidelines, which I've done. And I have to consider your need for rehabilitation, which I think was put in perspective by Dr. Shanken-Kaye, and he writes, without intensive lifetime treatment and close supervision, it's likely you will engage in future criminal behavior, including sexual offenses. You have a wanton disregard for the rules of society and the rights of others...So you've demonstrated through your conduct that this is a serious offense and you have no regard for anyone else, and the likelihood of you re-offending is in my judgment virtual certainty without proper treatment." (N.T. 7/22/13, pp. 87-93).

Given the nature of the offenses to which the Appellant was found guilty, the Appellant's criminal history, the Appellant's continuous criminal conduct, even when incarcerated, and his lack of remorse, Appellant's sentence was necessary, appropriate, and within this Court's discretion.

25

Circulated 01/15/2015 02:05 PM

CONCLUSION

For the foregoing reasons, we find that the issues Appellant has raised in this appeal are without merit.

BY THE COURT:

Date: _May 16, 2014_

_____
WALLACE H. BATEMAN, JR., J.

26

Circulated 01/15/2015 02:05 PM